## The Missouri Pacific Railway Company v. J. M. Cullers.

### No. 6862.

1. **Right of an Assignee to Sue.**—A citizen of the State sued upon a claim in part assigned him by an Indian and a citizen of the Indian Territory. Objection was made to that part so assigned. *Held*, the objection did not raise the issue as to the right of the Indian to sue, but to the right of the Indian to assign his claim to the plaintiff who could sue.

2. **Rights of Civilized Indian.**—It seems that an Indian of a civilized tribe is *a person*, and entitled to protection in the courts of this State of his rights of person and property.

3. **General Issue in Trespass.**—In an action for damages for the unlawful destruction of personal property the general denial puts in issue the ownership of the property destroyed.

4. **Action for Damages to Land is Local.**—The claim declared on so far as it applied to damages to the realty was local; and it being alleged to have occurred without the State, to that extent the right to recover did not exist through the courts of this State.

5. **Jurisdiction over Railway as Defendant.**—The Missouri Pacific Railway Company, though resident of Missouri, transacts business in Texas and where it has business offices and agents. It is subject to the local jurisdiction of the courts of this State.

6. **Local Actions.**—An action for injuries done to land situated beyond the limits of this State, and when no part of the injury was committed or performed within the State, is purely local and can not be maintained in any court in this State, but the remedy must be had in the jurisdiction where the land is situated.

7. **Possession as Evidence of Ownership.**—Actual, peaceable, and exclusive possession of personal property, if shown, is prima facie evidence of ownership, and sufficient to recover against one destroying it.

8. **Structures, When Part of Realty.**—Action for damages for the destruction by fire (by negligence of defendant) of certain property, including "house, kitchen, and stables," erected upon land not owned by plaintiff. It was not alleged that the *house*, etc., were personal property, or that plaintiff or the party under whom he sued had the right to move them, nor any other fact showing ownership apart from the land, the land belonging to an Indian tribe in the Indian Territory. *Held*, that the issue of whether the *house*, etc., was part of the realty should have been submitted as a defense.

9. **Same.**—The law presumes that structures belong to the land and are part of the realty.

10. **Property in Grass Cut Upon Lands of Another.**—Plaintiffs having shown the destruction of a quantity of hay made of grass cut by him upon the lands of an Indian tribe in the Territory, *held*, that the fact that the grass was cut upon lands not

owned nor controlled by them did not affect their right to recover. The grass was severed from the soil and formed no part of it.

**11. Presumption from Possession.** — While the presumption of ownership follows the possession of chattels, it does not follow that in an action for their value if injured or destroyed the defendant may not establish in defense that the plaintiff *was not* the owner.

**12. An Indian May Own Property.**—An Indian, and certainly a civilized one, is entitled to own personal effects and to be protected in their enjoyment until deprived of them by due course of law.

**13. Restrictions by Laws of the United States upon Rights of Indians.** Article 2103 of the Revised Statutes of the United States does not inhibit an Indian from assigning his claim for the value of property illegally destroyed. Such assignment was legal and the assignee would have the right to recover.

**14. ·Right of Property.** — Unless restricted by some positive law the right to property and dominion over it inherent in every human being would embrace the right of transferring it or using it in such manner as seems most advantageous to the owner.

**15. Charge.**—Where the court has instructed upon an issue it is not error to refuse a requested instruction upon the issue, if such charge be in part objectionable. It is not bound to reform and correct such instruction.

**16. Fact Case—Insufficient Evidence of Negligence.**—See facts held insufficient to show negligence of a railway company charged with negligently setting fire, etc., and also insufficient to prove the origin of the fire as from the train of the railway.

APPEAL from Grayson. Tried below before Hon. H. O. Head.

This is an appeal from a judgment against the appellant for $4519.79 for value of hay, hay machinery, house, kitchen and stable, and ranch implements, etc., destroyed by fire from alleged negligence of the railway company. The fire was in the Indian Territory.

*R. C. Foster* and *A. E. Wilkinson,* for appellant.—1. The verdict of the jury was contrary to the evidence and unsupported by the evidence in this, that there was no proof of negligence on the part of defendant, and it was clearly proved that the fire originated without any negligence on defendant's part, and that it had used due care and all proper precautions against the same, and the court erred in refusing to grant a new trial on the above ground. Railway v. Bartlett, 69 Texas, 83, and authorities cited.

2. The fire was not shown to have been communicated from defendant's engines, and it was affirmatively shown that it did not so originate, and the court erred in refusing to grant a new trial upon the above ground.

3. The following authorities are relied on:

(1) On the right to maintain suit in this State upon a local action accruing in the Indian Territory: Pelham v. Murray, 64 Texas, 477; Rorer's Interstate Law, 140, and authorities cited; Whart. on Conflict of Laws, sec. 711; Story's Conflict of Laws, secs. 543–554; 1 Chit. Plead., 271; Cool. on Torts, 471; McKenna v. Fiske, 1 How., 247–249; Living-

ston v. Jefferson, 1 Brock., 203; Rafael v. Verelst, 2 W. Black., 1055; Mostyn v. Fabrigas, Cowp., 161; 1 Smith's Leading Cases, 340; Worster v. Lake Co., 25 N. H., 525.

(2) Upon the right of an Indian residing in the Indian Territory to sue a citizen of Texas: Treaty with Choctaw Nation, September 27, 1830, art. 7, U. S. Stats. at Large, vol. 7, p. 334; Treaty with Choctaws and Chickasaws, June 23, 1885, art. 14, Laws and Treaties of Choctaw Nation, 27; Treaty with Choctaws and Chickasaws, April 28, 1886, art. 6; Rev. Stats. U. S., secs. 463, 466, 1839, 1840, 1992, 2103, 2116, 2117, 2118, 2128, 2147, 2149, 2120, 2156; Elk v. Wilkins, 112 U. S., 94; 2 Story on Cons., 3, et seq.; Id., 47, et seq.; Worcester v. The State of Georgia, 10 Curtis, 240–242; Goodell v. Jackson, 20 Johns., 693; Treaty with Chickasaws, October 30, 1832, art. 9, U. S. Stats. at Large, vol. 7, p. 384; Treaty with same, May 24, 1834, art. 3, U. S. Stats. at Large, vol. 7, p. 450; Treaty with Choctaws, January 17, 1837, arts. 1, 5, U. S. Stats. at Large, vol. 7, p. 605.

*Brown & Bliss* and *W. W. Wilkins*, for appellee.—1. The testimony was abundantly sufficient to show that the fire originated and spread through the negligence of appellant. Therefore the verdict of the jury is not contrary to nor unsupported by the evidence in this respect. Simms v. Price, Dall., 618; Hall v. Hodge, 2 Texas, 323; Anderson v. Anderson, 23 Texas, 639; Howard v. Ray, 25 Texas, 88; Railway v. Gorbett, 49 Texas, 573; Cushman v. Flanagan, 50 Texas, 389.

2. The buildings and structures destroyed, and for the value of which appellee sues, were personal property. The action is therefore transitory. Tied. on Real Prop., sec. 2; 1 Washb. on Real Prop., 3; Ashman v. Williams, 8 Pick., 402; Moody v. Aiken, 50 Texas, 65; Hutchins v. Masterson, 46 Texas, 554.

3. G. T. Black, a citizen of the Chickasaw tribe of Indians, could maintain a suit in the courts of Texas for the value of personal property negligently destroyed by appellant, and could transfer and assign to appellee his right to maintain suit therefor and to recover the same. Indians within the United States are not aliens within the meaning of our law. Coleman v. Doe, 4 S. & M. (Miss.), 40; Blacksmith v. Fellows, 7 N. Y., 401; Fellows v. Blacksmith, 19 How., 39; Jaha v. Belleg, 105 Mass., 208; The State v. Doxtater, 47 Wis., 278; Cherokee Nation v. Georgia, 5 Pet., 1; United States v. Rogers, 4 How., 567.

4. The hay sheds, stables, and the like which were destroyed by fire were personal property, and therefore a suit for damages on account of their destruction could be maintained in the courts of any State where service could be had. Rorer's Interstate Law, 141.

5. All persons may maintain suits in the courts of this State unless embraced in the exceptions, and Indians are not prohibited by the law

to maintain suits.    Dicey on Parties, 1; Wiley v. Keokuk, 6 Kans., 110; Swartzel v. Rogers, 3 Kans., 377; 10 Am. and Eng. Encyc. of Law, 440, note 5.

MARR, JUDGE, *Section A.*—Appellee J. M. Cullers filed suit against appellant in the District Court of Grayson County on March 4, 1887, and by amendment filed October 28, 1887, set up that on November 21, 1885, defendant negligently allowed sparks and fire to escape from its engine, which fire caught and destroyed the following property, to-wit: one portable engine, valued at $500; one hay press, valued at $400; one hay press, valued at $250; one mower, valued at $85; one mower, valued at $70; one derrick and hay loader, valued at $50; six bundles hay wire, valued at $15; one sickle grinder, valued at $10; two dozen hay forks, valued at $6; one rubber belt, valued at $30; 4500 bales of hay, valued at $1600; one hay shed, valued at $200; one house and kitchen, valued at $200; and one stable, valued at $50; all of which property was located in the Indian Territory, and was reasonably worth, at the time and place of its destruction, in the aggregate the sum of $3666.    Certain portions of the hay machinery and fixtures were owned by appellee G. T. Black and H. C. Lavo individually, but they were used in the partnership business of the firm, consisting of appellee Black and Lavo, which said firm was engaged at the time in the hay business, and the hay belonged to them jointly.    Appellee and Lavo were citizens of the county of Grayson, Texas.    Black was a citizen and member of the tribe of Chickasaw Indians.    Black and Lavo for valuable considerations had transferred their interest in the claim against the appellant for the destruction of said property to appellee, and had authorized him to sue therefor in his own name.

The trial before a jury on September 19, 1888, resulted in a verdict and judgment in favor of appellee for the sum of $4519.78, of which amount appellee remitted the sum of $100 on November 12, 1888. From this judgment appellant has perfected its appeal to this court.

Black transferred his claim to plaintiff to aid in the payment of the debts of the firm, which Cullers had partly paid and assumed the balance.

The assignments of error present several questions which require a decision thereof by this court.    The first and second assignments, relating to the sufficiency of the evidence in law to support the verdict of the jury, and the fourth assignment based upon the refusal of the court to allow the second instruction requested by the defendant, and dependent for support upon the nature of the evidence, will be postponed until we have determined the other questions presented by the appellant for our consideration.    Summarized, the other points contended for by appellant's counsel are that the court erred in refusing to instruct the jury, as requested by appellant, to the following effect:

1.   That Black, being a member of an Indian tribe and an Indian himself, can not sue, nor by assignment of whatever right of action he might have elsewhere authorize or confer upon plaintiff the right to sue in the courts of this State, and therefore plaintiff can not recover as to so much of the property destroyed as originally belonged to Black.

2.   In refusing to charge that the court below had no jurisdiction of controversies arising in the Indian Territory between Indian citizens and citizens of the United States—the defendant being a citizen of Missouri—and that a citizen of an Indian Nation can not transfer his claim for such damages to a citizen of the State of Texas, so as to enable the latter to maintain the suit thereon in the courts of this State.

3.   In refusing to charge that in any event the plaintiff could not recover damages for the destruction of "the houses, stables, and other real property situated on lands of the Choctaw Indians and belonging to a member of that tribe," and that nothing should be allowed "by reason of the burning of the dwelling house and stable mentioned in the petition."

4.   In refusing "to instruct the jury as requested in the fifth instruction, that plaintiff having shown no right to cut or put up the hay for the loss of which he sues, on the lands of the Choctaw Nation, is not entitled to recover anything by reason thereof."

The plaintiff J. M. Cullers, as well as Lavo, is a citizen of Texas and of the United States, but Black is a citizen of the Chickasaw Nation, and the property destroyed was at the time in the territory of the Choctaw Nation.   It will thus be seen that the plaintiff himself is under no disability to sue in our courts, unless it be that the fact that a part of his right to recover being derived from the Indian Black imparts to him a partial disability to that extent.   But it seems to us that even then the question would not be one of the personal disability of the plaintiff to sue, but would depend upon the right of Black to assign his claim.   If he could do this, then undoubtedly plaintiff as his assignee could maintain the suit on the claims, whether Black could have done so originally or not.   The plaintiff is entirely free from any disability which under the law would deny him a standing in the courts, if he possesses otherwise a right of action.   There is no question of "comity" in such case.   Rorer's Interstate Law, p. 155.   If, however, it were necessary for us to decide the question, we think we would have little difficulty in holding that an Indian like Black is a "person" within the meaning of our State Constitution and laws, and is thereby guaranteed the right of redress for injuries done to him "in his person, property, or reputation."   If he is not a *person*, then what is he?   Even the plea of an alien enemy has been denounced by our courts as an "odious plea," though it must be sustained if timely interposed.   Bishop v. James, 28 Texas, 294.   Every day alien citizens of friendly nations are allowed to sue in our courts, nemine dissentiente.

We should not hesitate to hold that an Indian—certainly a civilized Indian—is entitled to a redress of wrongs through our State courts. It is not a question of comity, but of right given by law, supposing the court otherwise to have jurisdiction of the controversy.   Swartzel v. Rogers, 3 Kans., 377; Wiley v. Keokuk, 6 Kans., 94; Id., 111; 10 Am. and Eng. Encyc. of Law, p. 440, note 5; Dicey on Parties, pp. 1, 2; Gho v. Julles, 1 Wash. (Ter.), 325; Cool. on Torts, p. 35.   The Federal courts, by deciding that an Indian is neither "an alien" nor a "citizen" until naturalized or admitted to citizenship, necessarily deprived those courts of jurisdiction over controversies between Indians and citizens of one of the States of the Union, whenever the jurisdiction is dependent upon the status of the parties.   This does not apply to the State courts.   But in the present case there was no plea in abatement or special exception to the disability of the plaintiff supposed to result from a supposed disability affecting Black's right to sue himself in person or through another; therefore the question is waived anyhow by the pleadings of the defendant.

It may be, however, that the right of Black to assign the claim and thus invest plaintiff with the ownership thereof, as well as the right of the plaintiff to recover damages done to such of the property as defendant contends was real estate, and if so was not owned by any of the parties, is sufficiently raised and presented by the pleading of the general issue, which we think throws on the plaintiff the burden of showing at least prima facie his right to the property destroyed or to the damages done thereto.

Before determining this branch of the case we deem it not inappropriate to here dispose of the question raised by the defendant and argued by counsel on both sides, that so much of the action as seeks to recover damages for the destruction of the house and kitchen and stable is purely local and not transitory, and therefore arose out of the jurisdiction of this State, and as a consequence will not, like a transitory action, follow the person of the wrongdoer so as to allow the courts of another jurisdiction to entertain jurisdiction thereof.   To all intents and purposes, so far as being sued is concerned, the appellant is a resident of this State and subject to its laws and to the jurisdiction of its courts.   Its road extends into and through the county in which it was sued, and it has an agent and representative there.   The court below had "jurisdiction over the subject matter," and therefore by express provision of law the defendant was amenable to the process of that court and liable to be sued in that county.   Sayles' Civ. Stats., art. 1198, secs. 21, 21b. This is unquestionably correct as to so much of the cause of action as is of a transitory nature.   Dicey on Parties, p. 67.   But while this is true as to transitory actions, and that therefore the court below undoubtedly had jurisdiction of so much of plaintiff's claim for damages as is of that nature, and would have had jurisdiction of the whole

claim if it had been clearly shown that the action is transitory as to all of the items for which damages are claimed, still, upon the other hand, it must now be regarded as the settled law of this State, in harmony with the rule of the common law, that an action or remedy for injuries done to land situated beyond the territorial limits of this State, and when no part of the act resulting in the injury was committed or performed within the State, is purely local and can not be maintained in any court of this State, but the enforcement of the remedy in such cases must be had within the jurisdiction where the land is situate. Morris v. Railway, 78 Texas, 17. The court below, therefore, should have charged the jury on the subject as requested by appellant, but with a proper qualification, so as to leave to the jury whether any of the property destroyed was in fact real estate or not. The necessity of such charge and of the jury being allowed under appropriate instructions to determine the issue whether the buildings were a part of the land or not will hereafter be more fully discussed in the several aspects in which the question is presented.

We now recur to the other questions: (1) Could there be any recovery for the destruction of the house, kitchen, and stable? (2) Could any part of the claim for damages be assigned by Black?

The appellee contends that the house and stable were chattels, not real estate. If so, it would seem that Black's right to them is as strong as to the other property held by him. It is admitted that the ownership was proved as alleged in all of the property, and it is alleged that the house, kitchen, and stable were "furnished" by Black and used in the partnership. It appears, however, that these buildings were on the lands of the Choctaw Nation. If, therefore, they were a part of the realty, it is very evident that plaintiff is not entitled to recover for their destruction either in his own right or in the right of Black or Lavo, since it is not pretended that any of the parties owned or held the title to the land. It will thus be seen that the solution of this particular question does not depend upon the citizenship of the parties, since, had the house and stable been "furnished" by the plaintiff himself instead of Black, to be used by the partners, the same issue would have been presented of the right to recover for injuries to the land which the plaintiff admits that he did not own nor did Black. How then could he recover damages for such injury? If allowed to do so, the true owner could also recover, and thereby the defendant would be subjected to a double recovery for the same act. Before proceeding further we desire to observe that if all of the property destroyed can be regarded as personal property, then we hold that the plaintiff established such prima facie right or title thereto as would entitle him to recover against a mere wrongdoer which showed no right to the property, if it is sufficiently proved that the defendant did destroy the property. The plaintiff proved that at the time the property was de-

stroyed he and his partners had the actual, peaceable, and exclusive possession thereof, which we think was prima facie evidence of ownership or right to the property sufficient to maintain the suit.   Express Co. v. Dunn, ante, 85; Cool. on Torts, 436, 437, 445, 446; Weymouth v. Railway, 84 Am. Dec., 764; Angell on Lim., 385, note 4.   But this does not eliminate the difficulty in his way to recover for the injuries, if any, to the land, because as we have said it is not claimed even that any of the parties owned the land, and as to that, therefore, the prima facie proof of ownership resulting from the possession is repelled.   In arriving at their verdict and assessing the amount of damages the jury undoubtedly allowed for the loss of the house, kitchen, and stable.  Can we hold that it is conclusively shown that these buildings were mere chattels and no part of the land?  If not, can we hold—would we be justified in holding—that the first paragraph of the charge of the court allowing a recovery therefor by plaintiff, as well as its refusal to give the fourth special instruction asked by the defendant as above set forth, were harmless errors?   We think not.

The defendant also in this connection assigns as error the first paragraph of the court's charge, and that the verdict of the jury is contrary to the law and the evidence in this particular.   The court charged the jury to the effect that under "the written transfers from Black and Lavo to the plaintiff in connection with the undisputed evidence" in the case, he could recover for all of the property if shown to have been destroyed by the negligence of the defendant, its servants, or employes. Such was the legal effect of the charge, and it put the buildings upon the same footing as the other property destroyed.   Under such circumstances we think that the issue of ownership of these structures and the right of the plaintiff to recover therefor, as well as the right to maintain the suit in the courts of this State for an injury to the buildings, is duly raised and presented.   Appellee attempts to obviate this, as we have said, by contending that the buildings were nothing more than chattels, or personal property.   He states all of the evidence, so far as we can discover, tending to support this contention, as follows, together with the authorities cited by him, viz.:

"The buildings and structures consisted of one hay shed, valued at $200; one house and kitchen, valued at $200; and one stable, valued at $50; all of which was located in the Indian Territory, near Cale's switch, on appellant's line of railway.  They were called the hay camp, and were used in the partnership business."  Tied. on Real Prop., sec. 2; 1 Washb. on Real Prop., p. 3; Ashman v. Williams, 8 Pick., 402; Moody v. Aiken, 50 Texas, 65; Hutchins v. Masterson, 46 Texas, 554.

It is not alleged that these structures were personal property in the petition, nor is any right to remove them from the soil alleged or proved. It is shown that Black furnished the house and kitchen and the stable to be used in the partnership.   But when did he acquire the right to

these buildings? When and how were they erected on the ground of another? Did he own the material and himself erect the structures, or were they already standing on the ground and thus taken possession of by him and "furnished," or appropriated by him to the use of the partnership of which he was a member? If he erected them, was it done in such a manner that they were still portable or removable as on wheels, and not fixed and attached to the soil as a house or stable generally is? We find no sufficient answer, if any, in the evidence on the subject as given in the briefs of the counsel, nor have we found any in the statement of facts.

The fact that the buildings were spoken of in connection with the other property as "the camp" does not prove that they are no part of the land. It may tend to show that the parties intended only to use them temporarily while camped there and engaged in cutting hay, but yet if Black in fact erected the buildings with his own material, but did so in such manner as to affix and attach them to the soil without permission of the owner, they became, as he had no interest in the realty, a part of the land and were lost to him. We think it will not be denied that a dwelling house and kitchen would generally be regarded as a part of the realty. In any event, whether they were movable fixtures or not in the present instance was a mixed question of law and fact, and the issue was not submitted to the jury at all. Authorities, supra. Beside, as we have said, it is not shown that Black in fact erected these buildings, and if he did he put them on the land of a "stranger" without license to do so.

Tiedeman in the second section of his work on Real Property (cited by appellee) says: "Land is the soil of the earth, and includes everything erected upon its surface or which is buried beneath it. Under the term land, therefore, are included the buildings made so under the doctrine of accession. * * * The general rule of law is that a permanent annexation to the soil of a thing in itself personal makes it a part of the realty. The rule applies in some cases even where the thing annexed is the personal property of another. Thus if a stranger erects a building upon the land of another, having no estate therein, the building becomes the property of the owner of the soil" [certainly where he knew he did not own the land]. * * * "But if such erection is in pursuance of a license granted by the owner of the soil, then the annexation will not make the building or structure a part of the realty." It seems, therefore, according to the weight of the evidence, that the structures without further proof on the subject would come under the operation of the general rule and not the exception. We certainly can not hold as a matter of law that there was no permanent annexation, and that the structures are movable fixtures, but on the contrary, in the light of testimony on the subject, an opposite deduction is more reasonable. We therefore think that there was

error in the first paragraph of the court's general charge, given as it was without any qualification, so as to leave to the jury the determination of this issue—whether there had been any permanent annexation to the soil. The same may be said of the refusal to allow the fourth special instruction.

In this connection we will dispose of the question as to the right of the plaintiff to recover for the hay. We think there was no error in the court's refusal to allow the fifth instruction requested by the defendant, "that the plaintiff having shown no right to cut or put up hay on lands of the Choctaw Nation," can not recover for its destruction. Plaintiff alleged that under the laws of that Nation the members of his firm had the right to cut and put up hay on the land, and that they had complied with all the requirements of law in the premises. When destroyed the grass had been severed from the soil and reduced to the actual possession of the parties, ready for market. It was no longer any part of the land. Their exclusive and peaceable possession thereof was prima facie sufficient to support a recovery against a wrongdoer. Under such circumstances and in the absence of proof that they did not have the right to put up the hay, a license to do so ought to be presumed. Abb. Trial Ev., sec. 4, p. 623. This is different from the right to recover for an injury to the land itself, for it clearly appears that none of the parties owned the land, and the damage, therefore, in legal contemplation could not be to them. They did not show even a possessory right to use and occupy the land itself, except temporarily, while engaged in making hay, and to the extent only that was necessary for that purpose.

Had there been proof that Black had the legal authority to erect the buildings on the land, and if he did so under such circumstances as gave him the right to remove the same, then the exclusive actual possession of the buildings would likewise have been sufficient evidence of ownership, if it were necessary under such circumstances to rely upon that fact. 1 Ct. App. C. C., secs. 517, 996, 780. As to permanent annexations, etc., see Cooley on Torts, pp. 428–430, note 1. But we have already sufficiently discussed the issue of fixtures vel non to indicate our views on that subject. At the risk of prolixity, however, we will make a few additional observations upon the matter of title in cases like the present, to prevent if possible a misapprehension of our views when construed in the light of some of the authorities which we have cited. Many of the decisions of the most eminent courts as well as able text writers announce the rule of law to be that in actions of trespass or trover or in kindred actions the wrongdoer can not avail himself of a title to the property in a third party with which he is not connected. We do not doubt that the proof of such fact would not be allowed to completely justify the wrongdoer anywhere, or prevent the plaintiff from recovering for the injury done to his possession as such,

.or to defeat an existent right to the possession of the property, etc.; but upon the other hand we are equally clear that if it is established that the plaintiff was not the owner of the property and had no other interest therein than the bare possession thereof, then, where the measure of damage relied upon is the value of the property injured, destroyed, or converted, in such case the defendant would not be legally liable to compensate the plaintiff for the value of property which he did not own, and ought to be permitted to prove title in a third party, not only for the purpose of disproving the plaintiff's right, or rather claim, for damages without an injury to himself, but also to avoid being compelled to respond in double damages for the same injury to the property. Clapp v. Glidden, 39 Me., 443. Until such outstanding title or a title in the defendant is established, however, the possessory right of the plaintiff is sufficient to justify a full recovery. Hence it is correctly said that the actual possession of property is prima facie proof of the ownership thereof, but it amounts to no more than this.

We now reach the consideration of the second question propounded above, viz., Could Black transfer his claim for damages? The appellant contends that an Indian, being under the control and protection of the government of the United States, can not own property nor transfer any claim for damages done thereto, and that his only redress is through the agencies provided by the general government. Without stopping to consider the inconsistency of this contention pointed out by appellee's counsel, we hold that the entire position is untenable, and that we do not doubt that an Indian—certainly a civilized one—is entitled to own personal effects or chattels and to be protected in their enjoyment until deprived thereof by due course of the law. Any other doctrine would be monstrous and contrary to the civilization of the age. His possessory right to keep and enjoy the property can not, as we think, in any event be denied upon any sound legal principle. Can he be robbed or stripped naked in our streets by lawless hands and yet have no recourse in the courts upon the ground that he is without title and legally incapable of acquiring title?

At the time of the destruction of the property in question it appears that Black was off his own reservation and was not occupying strictly tribal relations with his own nation—the Chickasaws—but was engaged in business and in a copartnership with white men and on his own account. We have found no law of the United States or of this State that would prevent him, or in fact any Indian, from acquiring personal property and of enjoying the fruits of his labor and industry; but the laws are quite to the contrary. While it may be true that there are some restrictions upon the right of Indians to make contracts or to dispose of either real or personal property of certain kinds, under some circumstances, imposed by the laws of Congress (Rev. Stats., arts. 2116,

2127, et seq.), still we do not believe that they apply to the transfer made by Black to the plaintiff. None of his property as such was in fact transferred, but only a claim for its loss. That contract does not come within the purview of article 2103, Revised Statutes of the United States, which, among other things, requires certain character of agreements made with Indians to be approved by the Secretary of the Interior. They are for the most part contracts to render services for an Indian or tribe of Indians in the collection of claims against the general government. This statute was construed by the Supreme Court of Indiana, and it was held that an Indian could assign or transfer even a portion of her annuity due from the general government in payment of her debts, and authorize the creditor to receive and apply the same to the extinguishment of the debt, and that agreements or transactions of this nature between an Indian and a citizen were not prohibited nor regulated by the laws of Congress. Godfrey v. Scott, 70 Ind., 259. The present controversy falls within the reasoning and principle of that case. We do not think that the laws of congress nor the provisions of any treaty of which we are advised were intended to confine an Indian exclusively to the Interior Department for a redress of grievances or would prevent him from assigning a right of action like the present. Unless restricted by some positive law, the right to property and dominion over it inherent in every human being would certainly embrace the right, if not the necessity, of transferring it or of using it in such manner as seems most advantageous to the owner. The mass of personal property would be of little benefit unless it could be sold, exchanged, or transferred by the owner, and Congress certainly did not intend to deny to an Indian like Black complete dominion over and full enjoyment of such of the property as was acquired by his own industry and not as a pensioner of the United States. The Supreme Court of Washington Territory held that an Indian sustaining tribal relations could contract, sue, and be sued the same as an "alien." Among other things the court says, in speaking of the right of an Indian to acquire property and make contracts, that "he had the same right and power to contract with appellee as the appellee had to contract with him. Money and all other personal property, which he certainly had the right to get and hold, he had also the right to use immediately and to promise in advance in all proper ways, in pursuit of his happiness." Gho v. Julles, 1 Washington (Ter.), p. 325, q. v. for a discussion of the right of an Indian to acquire and use property, to sue and be sued, and the necessity of such rights, etc. The nature of Black's claim for damages done to property being such as is ordinarily assignable, we are of the opinion that the fact that Black is an Indian does not render the assignment illegal, or inoperative, and therefore the court below did not err in refusing to instruct the jury as requested by appellant on this point. Having the rights both to transfer the property and to sue

in our courts, as we have seen, he could undoubtedly transfer the cause of action when it is otherwise assignable under the law.

We return now to the first, second, and fourth assignments of error, adverted to in the outset. In regard to the fourth assignment, which relates to the refusal of the court to allow the second instruction requested by the defendant, it may be said that the first proposition thereof was applicable, and if standing alone should perhaps have been given in order to call the attention of the jury pointedly to the issue, but it was mixed up and connected with other improper directions that should not have been allowed. It was not "wholly immaterial" whether the fire which had been raging on the previous day was "communicated by the engines of the defendant" and destroyed the hay camp, for there was some evidence to that effect. If that fire arose from the negligence of the defendant and in fact destroyed plaintiff's property, we do not see why the defendant should not be held responsible for the consequences of that fire. Defendant offered proof tending to show that the fire which destroyed the camp was a prairie fire not kindled by its engines. This was permissible, but the court had already charged the jury that if the fire that destroyed the property was not caused by fire escaping from the defendant's engines, but resulted from some other cause, they would find for the defendant. The court was not therefore bound to reform and rectify the requested instruction into a presentable shape.

The first and second assignments present more serious questions, viz., Does the evidence sustain the verdict, finding that the engines of the defendant communicated the fire which destroyed the property, and that this was due to the negligence of the defendant? The only facts proved by the plaintiff to show the origin of the fire or negligence upon the part of the defendant in this respect are the following: A short time before the fire was discovered two freight trains belonging to the defendant, one following the other after a short interval, passed over the road and near to the point where appellee claims the fire was started, and might therefore have set out the fire. Between three and four hours after the fire was first discovered a witness (Lavo) for the plaintiff went over the recently burned district and traced the course of the fire to where he says it "started." The place located by this witness and relied on by the plaintiff as the beginning point of the fire was at the foot of the railway embankment and within fifteen feet of the track, and south of the bayou. Here the witness testifies that he found "grass and brush still burning." On the next day another witness for the plaintiff observed ashes at the same point. It was proved that the country was very dry, and that at and during the time of the fire a furious wind was blowing, which swept the flames and shocks of burning grass before it with rushing rapidity and to great distances, defying every effort of the witness to protect the hay camp, which

(though situated at some considerable distance from the railway) was quickly reached and consumed by the fire. The defendant introduced a great deal of testimony to disprove the facts relied on by the plaintiff, and at least completely repelled the presumption of negligence that would be indulged from the fact that its engines communicated the fire, even if it be conceded that the fire was thus caused. The defendant proved by a number of witnesses that these engines were provided with the best improved fire arresters, in good condition, and properly operrated. Nay, more than this, that its road track was down grade at this point, and that these trains (as was the habit) passed along by their own momentum, without the use of steam or the working of the engines, and that in such case it is "impossible" for an engine to emit sparks and cinders, etc. These facts the plaintiff did not even attempt to disprove. There was also proof of the prevalence of "the prairie fire" which we have already mentioned.

But it may be said, as it is argued by appellee's counsel, that here is a conflict of evidence as to the origin of the fire, and that the jury had the right to conclude that it was set out by the act of the defendant. If we concede this, still where is the proof that the fire was kindled through the culpable negligence of the defendant? Both of these facts must be shown by a preponderance of the evidence, at least in the court a quo. Appellee answers that the defendant permitted combustible material to accumulate on its right of way. If so, that would be negligence, if that caused the fire. But the only proof of this is that "some grass and brush" (how much is not shown) were found burning at the beginning point of the fire, as *fixed by appellee, several hours* after the fire. If in fact dry and combustible, how is it that the grass and brush burned so long and continued to burn at the same place in the face of so strong a wind as was then prevailing? Would not such material have been swept away as fast as it burned, or been extinguished in a short time? The process of incineration was entirely of too great duration to be compatible with the hypothesis that the material was dry and combustible, under the circumstances. It seems to us that this brush and grass must have been green and difficult to burn, or else the fire did not in all probability originate at this point. If it did not, then there is no proof of negligence. The evidence in our opinion fails to show an accumulation of dry and combustible material at this point or anywhere on the right of way. One witness testifies that the fire started at a point north of the bayou, but this does not appear to have been on the right of way, and besides on that side of the bayou the defendant had recently cleaned and burned off its right of way. The law did not require nor permit the defendant to destroy or remove grass or other inflammable material not on its right of way.

In view of the evidence as presented in the record we are constrained, though not without some reluctance, to hold that it does not support

the verdict of the jury to the extent required by law in such cases, particularly as to the issue of negligence.   Railway v. Bartlett, 69 Texas, 79; Railway v. Witte, 68 Texas, 295; Railway v. Wallace, 74 Texas, 585; Railway v. Timmerman, 61 Texas, 663; Railway v. Levi, 59 Texas, 677.   Upon another trial additional· evidence may be adduced, or at least fuller explanations of the circumstances relied upon may be made on behalf of the plaintiff, and we forbear therefore from saying that the verdict is entirely without any evidence for its support. We have endeavored to dispose of all of the numerous questions presented, because it is apparent that they will arise again upon another trial, and this has unavoidably protracted the opinion to an extent much beyond our desire.

For the errors indicated, we think that the judgment should be reversed and the cause remanded.

*Reversed and remanded.*

Adopted June 16, 1891.