MR. JUSTICE HARRISON
dissenting:
I respectfully dissent.
The majority has found that this state’s courts cannot exercise jurisdiction over Mr. Flammond because he has insufficient contacts with the State of Montana. For the purposes of the URESA, he is a citizen only of the Blackfeet reservation. I believe that in rendering such a decision, my colleagues have continued on a course that leads even further away from the establishment of a common-sense rule of law in Indian jurisdiction cases.
This Court early recognized that there existed an inherent fairness in a rule that “. . . Indians may sue or be sued in state courts, since the latter are generally open to all persons irrespective of race, color, or citizenship.’ ” Bonnet v. Seekins (1952), 126 *356 Mont. 24, 26, 243 P.2d 317, 318, citing 27 Am.Jur. Indians, § 21 at 554. (Emphasis supplied.) Is it no longer the policy of this Court to strive to interpret the law in a fair and just manner without regard to the color of a person’s skin?
I am mindful that the majority is in keeping with the trend of case law in this area, but I cannot in good conscience support a legal trend which operates upon the inequitable and unfair premise that some citizens can be citizens for the purposes of state benefits, yet escape responsibility by the denial of that citizenship when a judgment to support his children may be rendered against him. It is my view this opinion serves only to perpetuate and expand an already unworkable legal framework.
When Congress made Indians citizens of the United States, it also made them citizens of the states in which they lived. “An Indian, becoming a citizen of the United States and residing in a state, is held to be a citizen of that state.” Confederated Salish and Kootenai Tribes, Mont. v. Moe (D.C. Mont.1975), 392 F.Supp. 1297, 1319, n. 5 (Judge Smith, dissenting), citing Boyd v. Nebraska (1892), 143 U.S. 135-162, 12 S.Ct. 375, 382, 36 L.Ed. 103. It is clear that this is no longer precisely true.
As to the benefits of state citizenship, Indians are entitled to the full measure of state services, but as to the burdens of state citizenship, the reservation Blackfeet Indians are citizens not answerable in our courts. Such a double standard is an affront to commonsense policies of fairness and equal treatment under the law. How can the Blackfeet people so heartily embrace Montana citizenship when educating their children, seeking state public assistance, voting, and using state roads on the reservation, yet use their status as on-reservation Indians as a shield against their social and legal obligations, without infringing on the equal protection rights of non-Indian Montana citizens? I would submit that they cannot.
We are faced with a choice of inferences in this case. We can infer that Congress intended to make Joseph Lloyd Flammond a full and complete citizen of this state, or that it did not. If it bestowed upon him all the rights and privileges of Montana citizenship, then *357 it must have intended that he be fully as answerable in state courts as any other Montana citizen. To infer otherwise would be to abandon the position that the Congress seeks to equalize the benefits and burdens of government.
My colleagues have concluded that Mr. Flammond has insufficient contacts with the state for it to exercise jurisdiction over him. Mr. Flammond travels on state roads when he is on the reservation. He is entitled to vote for persons who will conduct state affairs. He is entitled to educate his children in public schools. He is entitled to bring his claims and litigate them in state courts. He is entitled to receive any public assistance for which he qualifies. On appeal, Joseph Lloyd Flammond was represented by Montana Legal Services attorneys. Yet, when all this is considered, the majority concludes that Mr. Flammond has insufficient contacts with the State of Montana for state courts to entertain an action against him. In my opinion, Mr. Flammond is a Montanan and answerable to the state court like all other Montanans who enjoy these privileges.
The majority asserts that Kulko v. California Superior Court (1978), 436 U.S. 84, 96-97, 98 S.Ct. 1690, 1699, 56 L.Ed.2d 132, reh. denied, 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150, has essentially the same set of facts as in this case and stands for the proposition that a state’s exercise of personal jurisdiction would be both unreasonable and impermissible. I interpret the facts in Kulko to be completely dissimilar to the facts in this case. In Kulko the husband had virtually no contacts with the State of California. He lived in New York and his wife, who brought the action, lived in California. California attempted to exercise personal jurisdiction over Mr. Kulko, but the United States Supreme Court ruled that California did not have jurisdiction, and it would be unreasonable to compel his appearance. This was not a URESA action, and the suit was not brought in the state of the responding spouse. Compare this to the situation before us. The suit was a URESA petition designed for the convenience of the responding spouse and brought within a few miles of Mr. Flammond’s home. Is this more “unreasonable” than compelling his appearance in California, which he admits the State of California could do? I conclude that *358 the State of Montana’s exercise of personal jurisdiction would not only be permissible, but reasonable and proper, and in keeping with the spirit of URESA.
I am not concerned here with tribes, but with individuals. There is something fundamental in the concepts of fairness and equality that someone able to sue in a court should be amenable to suit. What we are saying is that Mrs. Flammond, a California citizen, cannot bring her action in state court solely because her husband is now an on-reservation Blackfoot Indian. Are we not denying her equal protection of the law under the Fifth and Fourteenth Amendments?
It should be further noted that our decision today does not just transfer Mrs. Flammond’s case to tribal court, but in a practical sense, may leave her without any remedy. The Blackfeet Code has not adopted any reciprocal provision which would create a mechanism by which they may process a URESA petition. Therefore, although the tribe has undisputed jurisdiction, it may be unable to proceed with the petition because of the absence of any reciprocal relationship with California. Assuming the tribe can litigate a URESA action, oral argument revealed that two URESA actions had been referred to tribal courts in Montana with no results. Unless that situation has changed, the tribal courts seem reluctant to decide URESA cases against on-reservation tribal members. Mrs. Flammond could either sue Mr. Flammond in California state court, or disregard URESA and come to Montana to sue in tribal court for relief. Either alternative clearly defeats the spirit and purpose of the URESA system.
For the purposes of argument, I will assume that the tribal court did entertain and resolve Mrs. Flammond’s case. I am still not persuaded that she could receive due process protections since there appears that there may be no adequate appeal from tribal court at the federal level. See Wells v. Philbrick (D.S.D.1980), 486 Supp. 807, 809, n. 2 (concluding that habeas corpus is unavailable in domestic relations cases). It is unfortunate that we have denied Mrs. Flammond her remedy. This maze of legal creations serves *359 only to impede the administration of justice and make a mockery out of judicial economy. Not only is URESA defeated, but the mechanical and practical problems with this decision lead me to believe that Mrs. Flammond and others like her will have a very difficult time obtaining relief.
Although I respect the majority’s decision, the result appears to me to be unfair to Mrs. Flammond and unjust to the people of Montana, and I cannot join in their opinion.